UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

BERNARD COLLINS, et al.,

      Plaintiffs,

v.

NATIONAL UNION FIRE INS.
OF PITTSBURGH, PA., INC., et al.,

      Defendants.

Case No. 2:08-cv-108
JUDGE GREGORY L. FROST
Magistrate Judge Terence P. Kemp

## OPINION AND ORDER

This matter is before the Court for consideration of a motion for partial summary judgment (Doc. # 47) filed by Defendants, National Union Fire Insurance Company of Pittsburgh, PA, Inc., Gallagher Bassett Services, Inc., and Claims Management Corporation, a memorandum in opposition (Doc. # 53) filed by Plaintiffs, Bernard and Mary Lou Collins, and a reply memorandum (Doc. # 55) filed by Defendants. Also before this Court is a motion for leave to file a supplemental affidavit (Doc. # 56) filed by Plaintiffs. For the reasons that follow, the Court **GRANTS** the motion for leave to file a supplemental affidavit (Doc. # 56) and **GRANTS IN PART** and **DENIES IN PART** the motion for partial summary judgment (Doc. # 47).

### I. Background

As its name implies, Defendant National Union Fire Insurance Company of Pittsburgh, PA, Inc. is an insurance provider. Among its products are occupational accident insurance polies that are administered and adjusted by Defendants Gallagher Bassett Services, Inc. and Claims Management Corporation ("CMC"). Plaintiff Bernard Collins, a truck driver, held such a policy since approximately 1992. On May 8, 2007, Bernard fell from the rear of his truck and sustained

1

injuries. He subsequently underwent surgery on his hip and has allegedly experienced ongoing medical issues with his hip and back. Bernard therefore filed a proof of claim form with Defendants to obtain benefits under the policy. Defendants provided twelve weeks of disability benefits for a back sprain, but denied medical expenses for the back. They also denied benefits in regard to Bernard's hip condition on the grounds that it was unrelated to the fall.

Bernard and his spouse, May Lou Collins, then filed the instant action on February 6, 2008. (Doc. # 2.) In a subsequently filed five-count amended complaint, they assert claims for failure to exercise good faith (Count I), breach of contract (Count II), negligence constituting willful and wanton conduct (Count III), loss of consortium (Count IV), and declaratory judgment (Count V). (Doc. # 20 ¶¶ 1-21.) Defendants have filed a motion for partial summary judgment on the claims for failure to exercise good faith, negligence constituting willful and wanton conduct, and loss of consortium. (Doc. # 47.) After the close of briefing on that motion, Plaintiffs then filed a motion for leave to file a supplemental affidavit executed by their counsel related to various documents Defendants produced during discovery. (Doc. # 56.) Defendants never responded to the motion, and the time for filing a memorandum in opposition has expired. See S.D. Ohio Civ. R. 7.2(a)(2). Both motions are now ripe for disposition.

## II. Discussion

### A. Standard Involved

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden

of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id*. (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52).

### B. Analysis

As a threshold matter, this Court must decide whether Plaintiffs' motion for leave to file a supplemental affidavit is well taken. (Doc. # 56.) The Local Civil Rules provide that a "[f]ailure to file a memorandum in opposition may be cause for the Court to grant any Motion, other than one which would result directly in entry of final judgment or an award of attorney fees." S.D. Ohio Civ. R. 7.2(a)(2). Review of the docket indicates that Defendants failed to file a memorandum in opposition to the motion, and granting Plaintiffs' motion would neither result in the entry of final judgment nor an award of attorney fees. Accordingly, the Court **GRANTS** the motion. (Doc. # 56.) The Clerk shall detach the proffered affidavit and file it on the docket.

(Doc. # 56-2.)

Turning to Defendants' motion for partial summary judgment, the Court finds that Defendants seek summary judgment on three claims. The first of these claims is Count I, under which Plaintiffs assert that Defendants failed to exercise good faith, and the second is Count III, which asserts a related negligence claim. The Sixth Circuit has explained a "bad faith" claim under Ohio law as follows:

> An insurer may be liable in tort when (1) without a lawful basis, it intentionally refuses to satisfy an insured's claim, or (2) without reasonable justification, it fails to determine whether its refusal to pay a claim had a lawful basis. *Mid-American Fire & Cas. Co. v. Broughton*, 154 Ohio App.3d 728, 798 N.E.2d 1109, 1115 (2003). A court may grant summary judgment to the insurer if, after viewing the evidence in the light most favorable to the insured, it finds "that the claim was fairly debatable and the refusal was premised on either the status of the law at the time of the denial or the facts that gave rise to the claim." *Tokles & Son, Inc. v. Midwestern Indemn. Co.*, 65 Ohio St.3d 621, 605 N.E.2d 936, 943 (1992). To withstand a motion for summary judgment, the insured must oppose the motion "with evidence which tends to show that the insurer had no reasonable justification for refusing the claim, and the insurer either had actual knowledge of that fact or intentionally failed to determine whether there was any reasonable justification . . . ." *Id.*

*Werner v. Progressive Preferred Ins. Co.*, 310 F. App'x 766, 769-70 (6th Cir. 2009). *See also B-T Dissolution, Inc. v. Provident Life and Acc. Ins. Co.*, 123 F. App'x 159, 164 (6th Cir. 2004) ("to prevail on a bad faith claim, an insured must show that there was no reasonable justification for the manner of handling or for the denying of the insured's claim" (citing *Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 644 N.E.2d 397, paragraph one of the syllabus (1994))). Intent is not an element of this reasonable justification standard. *Zoppo*, 71 Ohio St.3d at 555, 644 N.E.2d at 400. Therefore, "[s]ummary judgment in favor of the insurer is appropriate where, viewing the evidence in the light most favorable to the insured, the claim was fairly debatable and the refusal was premised on the status of the law at the time or the facts that gave rise to the

4

claim." *Id.* (citing *Tokles & Son, Inc. v. Midwestern Indem. Co.*, 65 Ohio St.3d 621, 629-30, 605 N.E.2d 936, 943 (1992)).

To apply this standard, the Court must begin with the language of the policy at issue. The parties agree that Bernard Collins' policy for Truckers Occupational Accident Insurance covers bodily injury caused by an occupational accident. Notably, however, the policy contains numerous exclusions, including the following: "This Policy does not cover any Pre-existing Conditions or any losses caused in whole or in part by, or resulting in whole or in part from, . . . sickness, disease or infections of any kind . . . ." (Doc. # 47-3, at 10.)

Several definitions contained within the policy are relevant to today's analysis. The policy defines "actively at work" to mean "an Insured Person performing his or her stated Occupational duties within the terms of his or her contractual obligations to the Contractee." (Doc. # 47-2, at 9.) The policy then defines "injury" to mean "bodily injury to an Insured Person caused by an Occupational accident while coverage is in force under this Policy, which results directly from and independently of all other causes in a Covered Loss. Injury also includes Occupational Cumulative Trauma as hereafter defined." (*Id.*) The "injury" definition section also provides that "[a]ll injuries sustained by an Insured Person in any one accident shall be considered a single injury." (*Id.*)

Two additional policy definitions are relevant. Under the policy, the term "occupational" means,

> with respect to an activity, accident, incident, circumstance or condition involving an Insured Person, that it occurs or arises out of or in the course of the Insured Person performing services within the course and scope of contractual obligations to the Contractee. Occupational does not encompass any period of time during the course of everyday travel to and from work.

(*Id.*) The policy also defines "pre-existing condition" to mean

> a sickness, disease or other condition of the Insured Person that, in the twelve (12) month period before the Insured Person's coverage began: (a) first manifested itself, worsened, became acute or exhibited symptoms which would have caused an ordinarily prudent person to seek diagnosis, care or treatment; (b) required taking prescribed drugs or medicine, unless the condition for which the prescribed drug or medicine is taken remains controlled without any change in the required prescription; or (c) was treated by a Physician or treatment had been recommended by a Physician.

(*Id.* at 10.)

The parties have devoted a considerable portion of their briefing to directing this Court to evidence supporting both the denial and the granting of benefits, which underscores the fact that, *if pre-existing conditions were not covered*, the coverage issue here was fairly debatable at the time of the denial. To support their argument, Defendants point to the investigation of Bernard Collins' claim by CMC adjuster Kimberly Fitch; Fitch describes her investigation and the results obtained in her affidavit. (Doc. # 47-7, Fitch Aff.) She recounts how, with some apparent difficulty, she had eventually obtained Bernard Collins' medical information and sent Beranard Collins for an independent medical examination. Fitch concluded that Collins' claim should be limited to 12 weeks, but that the hip replacement and additional benefits were improper because Collins' hip issues were not caused by a covered incident, *i.e.*, his fall. Due to apparent friction between Fitch and Collins, he began to communicate with the individual at CMC who would handle his appeal, Fitch's supervisor and a CMC claims administrator, Ana Haynes.

Haynes communicated to Collins that his "hip replacement was not covered by the Policy because it was necessitated by arthritis, which is a sickness/disease condition and not related to the occupational accident." (Doc. # 47-5, Haynes Aff. ¶ 6.) Haynes adhered to this conclusion at

6

the end of the appeal, concluding that "the Policy did not cover the treatment related to Mr. Collins' hip because the Policy, at section VI, excludes losses caused by sickness or disease." (*Id.* ¶ 10.) She noted that "[t]he medical records, IME doctor and Mr. Collins' treating physician Dr. Lee all indicate the hip condition was unrelated to the May 8, 2007 fall and the surgery was needed due to left hip osteoarthritis." (*Id.* ¶ 11.) Accordingly, Haynes sent Collins' counsel a January 21, 2008 letter citing to the policy exclusion for pre-existing conditions related in whole or in part to sickness or disease and explaining:

> Mr. Collins had an Independent Medical Examination (IME) on 10/15/07. Based on the IME report, Mr. Collins suffered a minor strain of his low back. The IME doctor indicates Mr. Collins should have recovered within 8 weeks from the date of injury. The doctor states Mr. Collins['] current disability is due to recovery from the left hip surgery and not because of the back condition.
>
> Based on the medical records as well as the examination, the IME doctor stated, "it is obvious that his hip has been a longstanding problem." The doctor goes on to say that the hip condition is unrelated to the 5/8/07 injury.
>
> In a letter received from Mr. Collins' treating physician, Dr. Frederick Lee, he states Mr. Collins has a diagnosis of severe left hip osteoarthritis.
>
> With the above in mind, it is GB/CMC's position that Mr. Collins['] hip condition is related to a sickness/illness condition and not related to his 5/8/07 injury. Therefore, we are unable to remit any benefits relating to the hip condition, per the terms and conditions of the policy. We have allowed 12 weeks of disability for the back strain and will pay medical charges incurred within this 12 week period. No benefits are payable past 8/1/07, for the back condition.

(Doc. # 47-6, at 14-15.) Review of the record, including the deposition testimony of various doctors involved, does not indicate that Haynes misrepresented the medical opinions offered.

To support the medical records and reports, Defendants initially direct this Court to the

7

deposition testimony of Dr. John Turski, III, the emergency room doctor whom Bernard Collins saw the day of his fall. Turski testified that he examined Collins, finding an abrasion on Collins' right forearm and "some tenderness in his back and his left hip." (Doc. # 41, Turski Dep., at 9.) Turski also testified that x-rays taken that day did not reveal any fractures, although they did indicate that Collins has osteoarthritis or degenerative joint disease of his left hip. (*Id.* at 10, 14.) Dr. Karl Ritch, the radiologist who read the x-rays the day after Collins' fall, similarly opined that he did not find any fracture, but did note that Collins' had advanced arthritis of the left hip. (Doc. # 39, Ritch Dep., at 12-13.) He concluded that there was "some facet arthritis at three of the . . . five lumbar levels." (*Id.* at 14.)

Two days after his fall, Bernard Collins saw an orthopedic spinal surgeon, Dr. James Fleming, Jr. Fleming testified in his deposition that Collins had admitted to long-standing problems with his left hip. (Doc. # 38, Fleming Dep., at 7.) Fleming opined that Collins had severe degenerative disease of the hip, with the result being bone grinding against bone. (*Id.* at 8.) The doctor also opined that Collins had "arthritic-type changes in the spine, and degenerative disc disease in the spine," although he concluded that most of Collins' symptoms were coming from the hip. (*Id.*) Fleming testified that he never reached an opinion as to what may have caused Collins' hip or back conditions. (*Id.* at 9.)

During the May 10, 2007 appointment, Fleming introduced Collins to Fleming's partner, Dr. Frederick Lee, a hip and knee specialist. Lee testified in his deposition that he had reviewed Collins' x-rays and found "very advanced arthritis of the left hip." (Doc. # 40, Lee Dep., at 8.) The doctor also testified that he communicated to the insurance company that he felt Collins' fall had exacerbated pre-existing left hip osteoarthritis. (*Id.* at 11; Doc. # 40-2, Ex. 5, at 17.) Lee

8

ended up performing a hip replacement on Collins. He testified that he did not discover any signs of fractures during the surgery and that he thinks that all of Collins' symptoms came from the osteoarthritis, which the fall exacerbated. (*Id.* at 13; Doc. # 40-2, at 2-3, 8.)

The final doctor of notable relevance is Dr. Walter Hauser.[1] According to Fitch, Hauser, the independent medical examiner who examined Bernard Collins, opined that Collins' hip problems arose from degenerative changes in the hip, that his hip replacement has caused his ongoing hip issues, and that Collins should have recovered from his back condition within eight weeks of the fall. (Doc. # 47-7, Fitch Aff. ¶¶ 34-35.)

All of the foregoing testimony, even where it conflicts, arguably supports the contention that Haynes' conclusion that Bernard Collins' hip condition was not the result of his fall was at least fairly debatable. For purposes of today's analysis and the limited issues before this Court, it does not matter whether that conclusion is ultimately correct or incorrect. What matters here is simply whether this Court, after viewing the evidence in a light most favorable to Bernard Collins, finds that his claim was fairly debatable and that Defendants' refusal to pay was premised on either the status of the law at the time of the denial or the facts that gave rise to Bernard's claim.

---

[1] The Court notes for purposes of capturing the full review of the record that another doctor who treated Bernard Collins was neurologist Dr. Debu Bhattacharyya. Bhattacharyya targeted Collins' pain, but does not offer much to inform today's analysis other than a general overview of what could cause the pain Collins continued to experience following his hip replacement. As Plaintiffs note in their memorandum in opposition, Bhattacharyya's testimony is "not a model of consistency." (Doc. # 53, at 9.) Of some note is that although Bhattacharyya had checked a claim form box indicating an "occupational injury," he never provided additional information to Defendants prior to the denial about this selection. At his deposition–which took place after the denial, of course–Bhattacharyya explained that his role was to treat Bernard Collins' pain, not to diagnose the cause of the condition.

Plaintiffs argue that they should evade summary judgment despite the foregoing for two basic reasons. They argue that a rider incorporated into Bernard Collins' policy waived all the policy exclusions, including the sickness and disease exclusion cited as the reason for denying the claim involved here. The rider at issue, titled "Pre-Existing Conditions Coverage Rider," provides:

> This Rider is attached to and made part of the Policy as of the Policy Effective Date shown in the Master Application. It applies only with respect to Covered Losses that occur on or after that date. It is subject to all of the provisions, limitations and exclusions of the Policy except as they are specifically modified by this Rider.
>
> **Pre-Existing Conditions Coverage.** In Section VI of the Policy, Exclusions is hereby waived for a Covered Loss described in Section IV of the Policy, however, in no event will benefits be payable for any Covered Losses caused in whole or in part by, or resulting in whole or in part from, any Pre-Existing Conditions, exceeding the Maximum Benefit Amount shown in the Schedule.

(Doc. # 47-4, at 3.) Plaintiffs read this language to all the policy exclusions generally and specifically the sickness and disease exclusion so that the policy covers injuries in which sickness or disease were a contributing factor.

As noted, the exclusions section of the policy provides that "This Policy does not cover any Pre-existing Conditions or any losses caused in whole or in part by, or resulting in whole or in part from, . . . sickness, disease or infections of any kind . . . ." (Doc. # 47-3, at 10.) Defendants argue that the effect of the plain language of the rider is to waive only the pre-existing conditions exclusion, not all the exclusions. The relevant exclusion language as a result of the rider would therefore essentially read: "This Policy does not cover . . . any losses caused in whole or in part by, or resulting in whole or in part from, . . . sickness, disease or infections of

any kind . . . ."

The plain language of the policy exclusion generally precludes coverage for losses caused to any degree by sickness or disease. But this expression of what is not covered must be read in conjunction with what is covered in light of the rider, namely pre-existing conditions. The policy in turn defines "pre-existing condition" to mean a sickness, disease, or other condition that meets any one of three sets of specified circumstances. Notably, however, neither Fitch nor Haynes informed Plaintiffs that the policy afforded coverage for pre-existing conditions. Nor did they inquire during their investigation whether in the twelve months preceding coverage under the policy, Bernard Collins' arthritis began to manifest itself, worsened, became acute, or exhibit symptoms that would have caused an ordinarily prudent person to take action of the sort specified in the policy definition of "pre-existing condition," to cite but the first of the three disjunctive circumstances set forth in the applicable policy provision.[2] (Doc. # 47-2, at 10.) Plaintiffs argue that they can evade partial summary judgment because the evidence shows–or at least creates a genuine issue of material fact over the issue–that Defendants failed to conduct a fair investigation and willfully failed to administer the claim properly.

Deposition testimony underscores the central conflict between Defendants' arguments and their witnesses. Defendants posit that the May 8, 2007 fall did not present an injury related to the hip condition. Fitch adopted this position in her December 12, 2007 denial of coverage

---

[2] As Plaintiffs note, Haynes' construction of the first set of circumstances conflicts with Defendants' own expert's construction of the policy language. This Court need not resolve the issue here because the point is not whether Collins can satisfy the condition, but whether there was an investigation (or the crediting of facts supporting) whether the potential basis for coverage applied.

letter, stating that "[r]ecords indicate the treatment received was primarily directed to the degenerative arthritis of the left hip and was an unrelated condition to the 5/8/07 date of loss." (Doc. # 53-2, at 5.) In her deposition, Fitch indicated that she had no information that the hip condition was caused by the fall. (Doc. # 46-3, Fitch Dep., at 47-48.) But she also admitted that she did not know the level of Bernard Collins' pain pre- and post-fall, had not inquired as to the pain levels, and was not aware of any evidence that Collins' hip had ever prevented him from working prior to the fall. (*Id.* at 48-50.)

It is notable that Mary Lou Collins has produced an affidavit in which she states that Fitch "told me that there was no coverage for my husband's hip because it was a preexisting condition." (Doc. # 53-2, Collins Aff., ¶ 3.) Fitch denies making this statement. As part of its summary judgment inquiry, the Court is required to credit the affidavit statement, which obviously presents a genuine issue over a material fact as to basis for Fitch's decision, her understanding of the policy and the rider, and her dealings with Plaintiffs. It is interesting to note in regard to this possible asserted basis for denial that Haynes testified at her deposition as follows:

> Q. And it would be the wrong thing to do to just say, Hey, we're denying because this arthritic hip is a preexisting condition; that would be wrong and that would be bad faith, wouldn't it?
> A. Yes.

(Doc. # 45-3, Haynes Dep., at 16.) Haynes also testified:

> Q. [L]ook at this sentence: "The hip claim was denied based on degenerative arthritis that was a preexisting condition." That's what Kim Fitch has said, right, denied based on arthritis that was a preexisting condition, right?
> A. Yes.

12

> Q. And that was the wrong thing to do, right?
>
> A. That was an incorrect statement.

(Doc. # 45-3, Haynes Dep., at 17-18.) Haynes went on to contest that the denial was based on a pre-existing condition and explained that Fitch had "just used bad language." (Doc. # 45-4, Haynes Dep., at 1-2.).

Like Fitch, Haynes never inquired into when Bernard Collins' hip problem began or whether it worsened prior to his fall. (Doc. # 45-2, Haynes Dep., at 6-7.) Also similar to Fitch, Haynes' denial of coverage continued to de-link the fall from the hip condition. Unlike Fitch, however, Hayne's letter denying coverage did expressly cite a policy-based basis for her decision. But in citing only to the sickness and disease exclusion, Haynes did not reference that some sicknesses and diseases presenting a pre-existing condition could be covered. In her January 21, 2008 letter, Haynes wrote that Hauser "goes on to say that the hip condition is unrelated to the 5/8/07 injury," but Haynes conceded at her deposition that Hauser never made such a statement. (Doc. # 45-3, Haynes Dep., at 1.) Moreover, Haynes stated in her deposition that the aggravation of arthritis would be an injury. (Doc. # 45, Haynes Dep., at 18.) She also conceded that Bernard Collins had suffered a severe injury. (Doc. # 45-2, Haynes Dep., at 9-10.) Later in her deposition she agreed with the statement that Collins' exacerbation of his arthritis was an injury. (Doc. # 45-3, Haynes Dep., at 2.)

Defendants misrepresented a portion of Hauser's analysis to Plaintiffs as a basis for denial of coverage. Some of what is left of Hauser's report supports Defendants, but Ohio law does not provide that simply employing and relying on an expert shields an insurer from a bad faith claim. *See Mundy v. Roy*, No. 2005-CA-28, 2006 WL 522380, at *4 (Ohio App. 2d Dist.

13

Mar. 3, 2006) (explaining that other evidence can puncture an insurer's reliance on an expert in a bad faith claim). Reliance on the expert must be reasonable and must provide reasonable justification for a denial of coverage. Thus, courts applying Ohio law have denied summary judgment when there is a genuine issue of fact over whether an insurer was reasonably justified in denying coverage. *See, e.g.*, *Keyser v. UNUM Life Ins. Co. of Am.*, No. C2-03-138, 2005 WL 2230203, at *9 (S.D. Ohio Sept. 17, 2005) ("Given that issues relating reasonableness are inherently fact-sensitive, and in this case would call for the Court to draw inferences in favor of UNUM in violation of Rule 56, summary judgment on Plaintiff's bad faith claim is DENIED."); *CSS Publishing Co. v. Am. Econ. Ins. Co.*, 138 Ohio App.3d 76, 86, 740 N.E.2d 341, 348 (Ohio App. 3d Dist. 2000) (finding a genuine issue of material fact existed because "competing reasonable inferences could be drawn from the evidence presented by the parties"). Consequently, Defendants' tainted "reliance" on Hauser does not entitle them to partial summary judgment today.

In summary, neither Fitch nor Haynes appeared to have considered whether a pre-existing condition existed. The former may have thought that a pre-existing condition was a basis for denial if Mary Lou Collins is to be believed, while the latter, not crediting Lee but crediting Hauser, misrepresented Hauser's report in a way that argues against coverage. Defendants now argue that Bernard Collins does not have a pre-existing condition and point in part to evidence presented to Fitch during her deposition to support this point. They also assert that Collins cannot demonstrate a pre-existing condition today. But the point is not whether Collins had a pre-existing condition, but whether Defendants explored whether he had a pre-existing conditions as part of their denial decision or carefully avoided such inquiry. The Court

14

is therefore curious when Defendants protest in their reply memorandum that "Plaintiffs argue that Defendants should have done something to allow Mr. Collins to qualify under the pre-existing conditions rider, but short of asking Mr. Collins to fabricate symptoms and treatment, what should have been done by Defendants is very unclear." (Doc. # 55, at 10.) This Court's reading of Plaintiffs' briefing did not lead to the conclusion that Plaintiffs were asking Defendants to violate their own policy to create coverage. Rather, it appeared to this Court that Plaintiffs were arguing that Defendants should have simply conducted a fair and full investigation; whether they did is a matter for the jury to decide.

In light of the depth of the investigation conducted, possible statements made regarding the medical evidence, and Defendants' reading of their own policy and its rider, there is a genuine issue of material fact here as to whether Defendants's denial of coverage for the hip condition was fairly debatable.[3] These disputes go to the core of whether Plaintiffs can show that Defendants had *no* reasonable justification for refusing the claim–a high bar to liability–and that Defendants either had actual knowledge of that fact or, perhaps more likely under the potential facts here, intentionally failed to determine whether there was any reasonable justification. The Court expresses no opinion as to the correctness of Defendants' decision to deny the full benefits sought other than to recognize that this Court cannot as a matter of law say today that the coverage issue was fairly debatable.

This leaves for discussion the last claim targeted by the motion for partial summary

---

[3] The Court notes that Plaintiffs point to medical evidence to support their claims for bad faith and negligence. But as Defendants correctly note, some of this evidence, notably the October 8, 2008 report by orthopaedic surgeon Dr. Kim Stearns, falls after the denial decisions by Defendants. In fact, at deposition, Stearns testified that the doctor's first contact with Bernard Collins was on October 6, 2008. (Doc. # 52-2, Stearns Dep., at 10.)

15

judgment, the Count IV claim for loss of consortium. In order to prevail on a loss of consortium claim under Ohio law, a plaintiff must prove " '1) that the defendant negligently or intentionally caused the injuries of the plaintiff's spouse; 2) that the plaintiff has suffered a loss of consortium and 3) [that] the injuries of [the] plaintiff's spouse have caused the loss of consortium.' " *Dyshko v. Swanson*, No. 5:08cv587, 2009 WL 1545462, at *12 (N.D. Ohio June 2, 2009) (quoting *Brockmeyer v. Mansfield Gen. Hosp.*, No. CA-2419, 1987 WL 7154, at *3 (Ohio App. 1987)).

Defendants argue that they are entitled to summary judgment on the loss of consortium claim because the claim is derivative of the bad faith claim and therefore necessarily fails when the bad faith claim fails. Defendants also argue that they are entitled to summary judgment because Mary Lou Collins cannot establish that Bernard Collins suffered a requisite bodily injury as a result of any underlying tort by Defendants. Plaintiffs do not respond to either argument in their memorandum in opposition.

Relevant to Defendants' first argument, the Sixth Circuit has explained:

> "[A] claim for loss of consortium is derivative in that the claim is dependent upon the defendant's having committed a legally cognizable tort upon the spouse who suffers *bodily injury*." Bowen v. Kil-Kare, Inc., 63 Ohio St.3d 84, 585 N.E.2d 384, 392 (1992) (emphasis added); *see also* Blatnik v. Avery Dennison Corp., 148 Ohio App.3d 494, 774 N.E.2d 282, 297 (2002) (holding that a "claim for loss of consortium . . . cannot stand because there is no evidence of bodily injury sustained"); *Cunningham v. Hildebrand,* 142 Ohio App.3d 218, 755 N.E.2d 384, 393 (2001) (holding that the trial court properly dismissed the loss-of-consortium claim brought by the plaintiff's wife where it was derived from the plaintiff's emotional distress claim and involved no bodily injury to the plaintiff).

*Campbell v. PMI Food Equip. Group, Inc.*, 509 F.3d 776, 791 (6th Cir. 2007). The derivative nature of the loss of consortium claim therefore means that it can be maintained only so long as

the underlying tort remains viable. *Yanovich v. Zimmer Austin, Inc.*, 255 F. App'x 957, 970-71 (6th Cir. 2007) (citing *Messmore v. Monarch Mach. Tool Co.*, 11 Ohio App.3d 67, 463 N.E.2d 108 (1983)); *Monak v. Ford Motor Co.*, 95 F. App'x 758, 768 (6th Cir. 2004) ("A claim for loss of consortium is a derivative action that does not exist absent a primary claim."). Accordingly, if the predicate tort claims discussed above did not remain in this action, Defendants would indeed have an argument that they are entitled to summary judgment on the claim for loss of consortium. *See Eilerman v. Cargill Inc.*, 195 F. App'x 314, 319-20 (6th Cir. 2006) (affirming grant of summary judgment on loss-of-consortium claim when summary judgment was properly granted on predicate intentional tort claim); *Greenwood v. Delphi Automotive Sys., Inc.*, 103 F. App'x 609, 612 (6th Cir. 2004) (affirming grant of summary judgment on a loss of consortium claim because "the loss of consortium claim cannot survive the dismissal of all the other tort claims"); *but see Bowen v. Kil-Kare, Inc.*, 63 Ohio St.3d 84, 92-3, 585 N.E.2d 384, 392 (1992) ("we hold that an action for loss of consortium occasioned by a spouse's injury is a separate and distinct cause of action that cannot be defeated by a contractual release of liability which has not been signed by the spouse who is entitled to maintain the action"). Because the tort claims remain pending, Defendants' first argument targeting the loss of consortium claim fails.

More successful for Defendants is their argument that summary judgment on the loss of consortium claim is warranted because the underlying tort claims did not present Bernard Collins with a bodily injury. To support this proposition, they direct this Court to the case of *Campbell v. PMI Food Equipment Group, Inc.*, cited above. In *Campbell*, the Sixth Circuit addressed whether plaintiffs had asserted a claim under Ohio law for loss of consortium when the underlying tort claims had not caused a bodily injury. The court of appeals explained:

17

> The Workers base their claims of loss of consortium on a claim of fraud and violations of the Worker Adjustment and Retraining Notification Act (WARN Act), 29 U.S.C. § 2102 (requiring, among other things, that employees who are to be terminated as part of a mass layoff or plant closing receive at least 60 days' written notice). But the Workers have not alleged that any of the terminated employees sustained a bodily injury *as a result of* the alleged fraud or WARN Act violations. The Workers have therefore failed to state a claim for loss of consortium, and the district court properly dismissed that claim.

509 F.3d at 791 (emphasis added). Applying this rationale to the instant case, the Court concludes that because the tort claims at issue herein did not cause Bernard Collins' bodily injury, Defendants are entitled to summary judgment on this sole claim.

## III. Conclusion

For the foregoing reasons, this Court **GRANTS** the motion for leave to file a supplemental affidavit (Doc. # 56), **ORDERS** the Clerk to detach the proffered affidavit (Doc. # 56-2) and file it on the docket, and **GRANTS IN PART** and **DENIES IN PART** the motion for partial summary judgment (Doc. # 47). The Court enters partial summary judgment for Defendants on the Count IV claim for loss of consortium. All other claims remain pending.

**IT IS SO ORDERED**.

                                            /s/ Gregory L. Frost  
                                            GREGORY L. FROST  
                                            UNITED STATES DISTRICT JUDGE